Sparkill Realty Corporation et al., Respondents, *v.* The State of New York, Appellant. (Claim No. 19587.)

(Argued May 29, 1935; decided July 11, 1935.)

*John J. Bennett, Jr., Attorney-General (Walter H. Pollak, Henry Epstein, Carl S. Stern, Arthur H. Goldberg* and *Irving Birnbaum* of counsel), for appellant. The award,

disregarding all factual evidence, rests upon guesses as to the profits of a business that had never begun to operate. (*N. Y. C. R. R. Co.* v. *Maloney*, 234 N. Y. 208; *Hamilton* v. *Railroad Co.*, 190 Penn. St. 51; *Forest Preserve District* v. *Caraher*, 299 Ill. 11; *Kossler* v. *Railway Co.*, 208 Penn. St. 50; *Cramer* v. *Grand Rapids Show Case Co.*, 223 N. Y. 63; *Central Coal & Coke Co.* v. *Hartman*, 111 Fed. Rep. 96; *Bliss Co.* v. *Buffalo Tin Can Co.*, 131 Fed. Rep. 51; 195 U. S. 630; *City of Syracuse* v. *Stacey*, 45 App. Div. 249; 169 N. Y. 231; *Sauer* v. *Mayor*, 44 App. Div. 305; *Newton* v. *Armstrong*, 63 Hun, 628; *Matter of Gilroy*, 26 App. Div. 314; *Matter of City of Rochester* [*Smith St. Bridge*], 234 App. Div. 583; *Banner Milling Co.* v. *State*, 240 N. Y. 533; *Mitchell* v. *United States*, 267 U. S. 341.) The guesses as to future profits rest upon assumptions that were neither proved nor provable. (*Bliss Co.* v. *Buffalo Tin Can Co.*, 131 Fed. Rep. 51; 195 U. S. 630; *United Fuel Gas Co.* v. *Railroad Comm.*, 278 U. S. 300; *Matter of New York, L. & W. R. Co.*, 33 Hun, 639; *Blanchard Co.* v. *Rome Metallic Bedstead Co.*, 184 App. Div. 187; *Hamilton* v. *Railroad Co.*, 190 Penn. St. 51; *San Diego Land Co.* v. *Neale*, 88 Cal. 50; *Cox* v. *Philadelphia R. R. Co.*, 215 Penn St. 506.)

*Jackson A. Dykman, Benjamin McClung* and *Henry J. Hemmens* for respondents. The award is not excessive. *Gosstol Realty Corp.* v. *Gillman*, 224 App. Div. 63; *Johnson* v. *City of Lowell*, 134 N. E. Rep. 627; *Brooklyn Union Gas Co.* v. *Prendergast*, 7 Fed. Rep. [2d] 628; *Ottinger* v. *Brooklyn Union Gas Co.*, 272 U. S. 579; *Matter of Comrs. of Palisades Interstate Park*, 164 App. Div. 957; *Moore* v. *Eadie*, 245 N. Y. 166; *Matter of City of New York*, 198 N. Y. 84; *Balshan* v. *State*, 230 App. Div. 142; 255 N. Y. 596.) There were no errors in the admission of evidence. (*Dilleber* v. *Home Life Ins. Co.*, 87 N. Y. 79; *Cole* v. *Fall Brook Coal Co.*, 159 N. Y. 59; *Stearns* v. *Field*, 90 N. Y. 640; *Sparkill Realty Corp.* v. *State*, 238 App. Div. 656; *Matter of City of Rochester* [*Smith St. Bridge*], 234

App. Div. 583; *Banner Milling Co.* v. *State,* 240 N. Y. 533; *Fowler* v. *State,* 234 App. Div. 166; 259 N. Y. 594; *Matter of Niagara, L. & O. P. Co.* v. *Horton,* 231 App. Div. 402; *Sauer* v. *Mayor,* 44 App. Div. 305.) No rule of law forbids consideration of profitable operation as one element in determining value. (*Matter of Comrs. of Palisades Interstate Park,* 164 App. Div. 957; *Baumann* v. *City of New York,* 227 N. Y. 25; *People ex rel. Powers* v. *Kalbfleisch,* 25 App. Div. 432; *Reisert* v. *City of New York,* 174 N. Y. 196; *Bates* v. *Holbrook,* 89 App. Div. 548; *Barnes* v. *Midland R. R. Terminal Co.,* 218 N. Y. 91; *Smith* v. *State,* 145 Misc. Rep. 899; *Matter of City of New York,* 198 N. Y. 84.)

LOUGHRAN, J. This is a claim against the State for compensation for property at Piermont, Rockland county, New York, appropriated for an extension of the limits of the Palisades Interstate Park under article 16, part 9, of the Conservation Law (Cons. Laws, ch. 65). The Court of Claims found that the value of the property was $1,650,000. The claimants (owner and lessee respectively) were jointly awarded judgment for that amount with interest of $444,950 and a disbursement of $5,000 for an abstract of title, in all $2,099,950. On this appeal by the State from an affirmance by the Appellate Division the principal question is whether the award was made on an erroneous principle.

The property was taken October 11, 1928. It comprises 164 acres on the west shore of the Hudson river eighteen miles north of the city of New York. In 110 acres is a large deposit of trap rock. The remaining tract is marsh land lying between this deposit and deep water in the river. The unimproved land was acquired by the claimant owner in 1914. Its development as a quarry, first undertaken by the claimant lessee in 1927, was within five months of completion at the date of appropriation by the State. The cost of the interrupted exploita-

tion was found to have been $584,260.65. The judgment thus implies an award for the site of more than $1,000,000. The claimant owner has not increased its original authorized capital of $30,000. In the period from 1923 to 1925 it offered to sell the undeveloped property for $50,000, for $100,000 and for $150,000. From 1925 to 1928 the land was assessed for taxation at not more than $14,540. (See Court of Claims Act, § 22-a, subd. 2.) There was uncontradicted testimony that any increase of the value of stone lands in Rockland county between 1923 and 1929 did not exceed ten per cent. Two witnesses for the State who before this appropriation and after it had bought stone lands on the same trap ridge for then operating quarry companies appraised the land taken at $120,000 — $750 to $1,000 an acre. These witnesses were not cross-examined. This background acutely invites consideration of the theory of the judgment against the State.

The claimants submitted no proof of the market value of the land as such. Instead they offered evidence that above mean high-water mark on the property are 15,314,221 cubic yards of quarriable trap rock which would yield 27,365,997 cubic yards of broken stone of a quality up to standards prescribed for customary uses of trap rock, and evidence that by an additional expenditure of $503,471.30 the plant of the claimant lessee could have been equipped to quarry, crush, store and load on scows 750,000 cubic yards of crushed stone annually. These facts were then assumed in a hypothetical question put to each of four expert witnesses for the claimants. The further form of the hypothesis was as follows: " Assume the stone could be quarried, crushed and loaded on scows at the quarry at an average cost of 70 cents and at an average freight cost of 40 cents per cubic yard, or a total of $1.10 per cubic yard, delivered in scows alongside docks in the Metropolitan New York and New Jersey district, which cost includes maintenance, taxes,

depreciation and depletion. Assume 750,000 cubic yards of broken stone at least from this quarry can be marketed in this district annually at an average price of $1.90 per cubic yard alongside docks in scows. What, in your opinion, was the market value of the property and existing improvements on the day of entry and appropriation, October 11, 1928, that is to say, the amount in cash which a willing purchaser would pay and a willing seller would take? " The testimony so elicited appraised the value of the property in figures ranging from $4,331,027.30 to $4,800,000.

This procedure in itself proved nothing. As long ago was said of similar testimony, " All the witness has done is to establish by calculation, that such a stock, from such a time, will produce so much. He does not himself prove any fact, and the calculations he has made must therefore depend upon the facts which are proved by others." (ERSKINE, L. C., in *Lord Melville's Trial*, 29 How. St. Trials, 1066; 1 Wigmore on Evidence [2d ed.], § 672.) The hypothetical question, although in the end it called for testimony in the guise of opinions as to market value, could have been answered only on the fixed assumption that the property of the claimants was to have been operated for a generation at an annual profit of half a million dollars. Accordingly we are led to seek in the record some basis for that assumption.

There was no concrete proof that the market in the Metropolitan New York and New Jersey district would absorb an accession of 750,000 cubic yards of crushed trap rock annually. Indeed the Court of Claims refused to take an opinion from the experts for the claimants on that subject, because " too many elements enter into the answer." There was, of course, no proof of a production and transportation cost invariable at $1.10 per cubic yard for decades to come, nor of a market stabilized at $1.90 over an equal period in the future. These hypothesized profit factors had no reality and any conclusion thereby

contrived was inadmissible. (*New York Central R. R. Co.*
v. *Maloney*, 234 N. Y. 208; *Matter of New York, L. & W.
Ry. Co.*, 33 Hun, 639; *Matter of Gilroy*, 26 App. Div.
314; *United Fuel Gas Co.* v. *Railroad Commission*, 278
U. S. 300. See the authorities collected in a note in
7 A. L. R. 163.) This is not to say that one valid expert
opinion may not be based on another (1 Wigmore on
Evidence [2d ed.], § 682), but that opinion testimony
may not be predicated of a sequence of conjectures.
(Cf. *Lamb* v. *Union Ry. Co.*, 195 N. Y. 260, 266.)

There was here no element of business good will, of
going plant value, or of profit automatically produced by
the property itself. (Cf. *Banner Milling Co.* v. *State*,
240 N. Y. 533; *Matter of State Reservation at Niagara*,
16 Abb. N. C. 159, 199; 7 A. L. R. *supra*, pp. 171–174.)
This quarry had never been worked. Before the taking,
a willing buyer could have acquired at best an unfinished
plant and the opportunity to operate it after completion.
To the full market value of that privilege the claimants
were entitled, but to nothing more. (*Jackson* v. *State*,
213 N. Y. 34; *New York Central R. R. Co.* v. *Maloney*,
*supra*, p. 218; *Langdon* v. *Mayor, etc., of New York*, 133
N. Y. 628, 631.)

We turn now to the decision of the Court of Claims
for the rationale of its award. Formal recitals apart, the
findings are, in substance, a recasting of the foregoing
hypothesis which the claimants made the single vehicle
of their proof of market value. The gist of the decision
is as follows: " The plant  *  *  *  was designed for
crushing, conveying, storing and loading approximately
750,000 cubic yards of traprock from the quarry annually.
*  *  *  The deposit of traprock  *  *  *  contains a
minimum of 15,314,221 cubic yards  *  *  *  which,
after crushing, would yield a minimum of 27,365,997 cubic
yards of broken stone  *  *  *  sufficient  *  *  *  to
permit of the operation of a quarry for a period of at least
twenty-five years.  *  *  *  Crushed stone produced

from this deposit would meet the requirements of the standard specifications in the State of New York and in the State of New Jersey * * * and could be loaded on scows at the plant and transported by water to the Metropolitan New York and New Jersey market. * * * At the time of the appropriation approximately 10,800,000 cubic yards of coarse aggregates were sold annually in said district of which quantity between 4,000,000 and 5,000,000 cubic yards was crushed stone. * * * Traprock is desirable as a crushed stone aggregate. * * * There is a market in this Metropolitan District in which crushed stone from the appropriated property could be * * * marketed at a profit." The State requested a finding that success of the business of crushing and marketing trap rock depends upon the efficiency of the management of the quarry enterprise. This request the court refused.

From these premises was drawn the conclusion of a fair and reasonable market value of $1,650,000 for the " entire property, plant and equipment." The appraisals of the four experts for the claimants are cited in the opinion of the Court of Claims. The only other evidence of market value was that offered by the State. Tested by that evidence the award is grossly excessive. " No award shall be made on any claim against the state except upon such legal evidence as would establish liability against an individual or corporation in a court of law or equity." (Court of Claims Act, § 26.) ' It is apparent, we think, that this award was made upon a conclusion conjectured from data founded only in speculation.

The judgment of the Appellate Division and that of the Court of Claims should be reversed, and a new trial granted, with costs to abide the event. (See 268 N. Y. 632.)

LEHMAN, O'BRIEN and FINCH, JJ., concur; CRANE, Ch. J., HUBBS and CROUCH, JJ., dissent.

Judgments reversed, etc.