Argued September 11, 1962, reargued February 6, reversed and
remanded March 13, 1963

STATE HIGHWAY COMMISSION *v.* NUNES ET AL

379 P. 2d 579

*J. Robert Patterson,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Robert Y. Thornton, Attorney General, Salem, and L. I. Lindas, Assistant Attorney General and Chief Counsel for Oregon State Highway Commission, Salem.

*Stanley C. Jones,* Medford, argued the cause for respondents. *Joel B. Reeder,* Medford, reargued the

cause for respondents. On the brief were Jones, Reeder & Bashaw.

Before McAllister, Chief Justice, and Rossman, Perry, Sloan, O'Connell, Goodwin and Denecke, Justices.

O'CONNELL, J.

Plaintiff appeals from a judgment of the circuit court of Jackson county in a highway condemnation action to secure a right of way for highway purposes. Defendants had been in the business of selling topsoil, sand, and gravel from the property. The highway necessitated the taking of a part of the land. As a result of the taking plaintiff was deprived of access to a part of his land not taken. Plaintiff alleged that these parts had a value of $7,800. Defendants' amended answer claimed the sum to be $37,250. The jury fixed the value at $24,500 and judgment was entered accordingly.

Plaintiff contends that the trial court erred in over-ruling plaintiff's objection to the direct examination of James Nunes, one of the defendants, concerning the market price of gravel, topsoil, and sand when sold by the yard.[1] Plaintiff acknowledges that in

---

[1] The following is illustrative of the testimony of witness Nunes:

"Q. Now, when one is desirous of purchasing topsoil, sand and gravel, by what unit is it purchased?

"A. By the yard—cubic yard.

"Q. Does one selling topsoil, sand and gravel ever sell by the acre?

"A. Not if he is informed, he wouldn't.

"Q. Now, do you value the property that is the subject of this inquiry as a unit for topsoil, sand and gravel purposes only?

"A. My place there?

fixing the value of land a witness may take into account the fact that the land contains minerals which enhance its value. But it is plaintiff's position that the witness may not ascertain this enhanced value by multiplying the number of units of the mineral by the market price per unit. Defendants concede that the product of such a multiplication process taken alone may not be used as the value of the land or added to the value of the land aside from the minerals. However, defendants argue that quantity, quality and price per unit of the minerals may be considered as a factor in evaluating mineral land.

Pursuing this theory, defendants elicited from their witnesses testimony as to the quantity, quality and price per unit of the sand, gravel and topsoil, but in each instance the witness testified that the materials were evaluated "in place" and regarded only as a factor in arriving at the value of the land. The trial court adopted the view urged by defendants. Thus, in ruling on plaintiff's objection to the testimony of defendants' witness Nunes as to the then current value of topsoil "in place," the trial court said:

"THE COURT: I might say, Ladies and Gentlemen of the Jury, with reference to this, the basic question always is the damage to the Defendant in terms of fair cash market value as of February 9th, 1961, and that is the entire tract. You

---

"Q. Yes, your place.

"A. Yes, sand and gravel and topsoil is what it is most valuable for.

"Q. And in order to arrive at your opinion of the fair cash market value of the property in question, have you taken into consideration what the going market was in February of 1961?

"A. Yes, I have.

"Q. For topsoil, sand and gravel.

"A. Yes I have."

are not at any time to take an acre, for example, and multiply it by the total acreage to arrive at the amount. Your basic question is to take the damage to the Defendant in terms of fair cash market value to the entire tract, and to not arrive at it by the process of multiplication, if you understand what I mean—that is, by a process of multiplication of cubic yards or a process of multiplication of acres. The basic question is the damage in terms of fair cash market value to the entire tract. That is the question you are going to have to arrive at. The Court is only admitting evidence of the market value of a cubic yard of topsoil or a cubic yard of sand or gravel, insofar as it affords the reason or basis for arriving at the basic question, which is the entire tract."

Plaintiff objected to the proferred testimony upon the ground that the estimate of the value of the topsoil, sand and gravel on a cubic yardage basis interjected into the case evidence of the value of items of personal property sold as a commodity and as such not related to the value of the land. Defendants countered with the argument that "It would be impossible for a prospective purchaser or this jury to determine the total value of the land if they didn't know how much the sand and gravel was selling for—not for the purpose of making a multiplication procedure but for the purpose of making an evaluation." Defendants' position is supported by one line of authority.[2] The leading case presenting this point of view is *United States v. Land in Dry Bed of Rosamond Lake, Cal.,*

[2] Cade v. United States, 213 F2d 138 (4th Cir 1954); 293.080 Acres of Land, Etc. v. United States, 169 F Supp 305 (D.C. W.D. Penn 1959); Foster v. Mississippi State Highway Comm., (Miss) 140 So2d 267 (1962); State v. Noble, 8 Utah2d 405, 335 P2d 831 (1959); State v. Mottman Merc. Co., 51 Wash2d 722, 321 P2d 912 (1958).

143 F Supp 314, 322 (D.C. Cal. 1956). In that case the court said:

> "* * * [t]he landowner is entitled to have an expert or lay witness describe the commodity or substance on the land, the quantity thereof, the going price thereof as *factors* only, upon which the expert may in part base his value as to the *fair market value* of the parcel in question; that a landowner is not entitled to present testimony as to the fair market value of the mineral or timber or other substance apart from the value of the land. * * * In other words, a clear distinction must be drawn between what is presented and considered as a *factor* underlying the expert's opinion as contrasted with opinion as to the fair market value of the substance, timber or mineral itself, apart from the land."

We have not passed upon the precise question presented although in *State Highway Comm. v. Arnold,* 218 Or 43, 341 P2d 1089, 343 P2d 1113 (1959) we disapproved the use of the multiplication method in arriving at the value of the property in that case.

■ The cases elsewhere seem to fall into three categories; (1) cases holding that a witness may not use the multiplication method in arriving at the value of land;⑨ (2) cases holding that the multiplication method may be used but that the witness may not, at least on direct examination, testify specifically as to the quantity and price per unit of the materials in the land;⑩

---

⑨ United States v. 620.00 Acres of Land, Etc., 101 F Supp 686 (W.D. Ark 1952); United States v. 13.40 Acres of Land in City of Richmond, 56 F Supp 535 (D.C. N.D. Cal. 1944); United States v. Indian Creek Marble Co., 40 F Supp 811 (D.C. E.D. Tenn 1941); Sparkill Realty Corporation v. State, 268 NY 192, 197 NE 192 (1935); Reading & P. R. Co. v. Balthaser, 119 Pa 472, 13 A 294 (1888).

⑩ See e.g., Hollister v. Cox, 131 Conn 523, 41 A2d 93, 156 ALR 1412 (1945); Gulf Interstate Gas Co. v. Garvin, 303 SW2d 260

and (3) cases holding that the witness may not only use the multiplication method but he may also explain specifically how he used it, i.e., by referring to the quantity and price per unit of the materials in the land.[5] All courts agree that if the multiplication method is used the product arrived at by multiplying the quantity of materials by the unit price cannot be taken as the value of the land but must be used only as a factor in evaluating the land itself.[6]

From the standpoint of the rationale upon which the cases rest they may be divided roughly into (a) those which regard the multiplication method as intrinsically unsound because it is speculative [these are the cases grouped in (1) above], and (b) those which consider the method as unobjectionable if properly applied [these are the cases grouped in (2) and (3) above]. One other difference in rationale may be noted which explains the conflict between the cases in groups (2) and (3) above. Some courts feel that although the multiplication method is unobjectionable when employed by an expert, it should not be exposed to the jury because it is likely to confuse the jury or be used by them as the sole basis of the estimate of value of the land sought to be taken and thus distort the estimate. This appears to be the rationale of the cases in group (2) above. On the other hand, the courts in group (3), which accept the multiplication method as a valid process in arriving at an estimate of value,

(Ky 1957); State v. Mottman Merc. Co., 51 Wash2d 722, 729, 321 P2d 912, 916 (1958), dissenting opinion Mallery, J.; McSweeney, Evaluation of Mineral Rights, 5 Appraisal and Evaluation Manual of the American Society of Appraisers 153, 159 (1960).

[5] See cases in note 2 supra.

[6] United States v. Indian Creek Marble Co., 40 F Supp 811, 822 (D.C. E.D. Tenn 1941); Nedrow v. Michigan-Wisconsin Pipe Line Co., 245 Iowa 763, 61 NW2d 687, 691-692 (1953); State v. Mottman Merc. Co., 51 Wash2d 722, 321 P2d 912 (1958).

find no objection in permitting the jury to see specifically how the process was used.

■. We must make a choice between these competing rationales. We shall first consider whether the so-called multiplication method is an acceptable method if properly employed. There could be no objection to the use of the multiplication method in arriving at a figure to be employed as a factor in evaluating the land[7] where the quantity of the material (e.g., sand, gravel, timber) is known and there is a present market for all of the material sought to be taken. The use of the multiplication method presents certain problems where that is not the case. The reasons for rejecting the method are well stated in the quotation from *United States v. Indian Creek Marble Co.*, 40 F Supp 811 (D.C. Tenn 1941) set out in *State Highway Comm. v. Arnold*, supra at 77.[8] Certainly the use of the multiplication method without making deductions for the cost of production and other operating expenses would not be proper.[9]

The multiplication of unit price times quantity would be a meaningless computation except as a part of a method of arriving at the profits which the sale

[7] As noted by State v. Mottman Merc. Co., 51 Wash2d 722, 729, 321 P2d 912, 917 at 918 (1958) (Mallery, J., dissenting): "* * * Testimony as to the unit price of gravel is not a criterion of what a willing purchaser would pay, *in the absence of a showing that there is a present demand for the entire quantity at the unit price*." But see, State v. Noble, 6 Utah2d 40, 305 P2d 495, 501 (1957), quoting contrary language from Reiter v. State Highway Commission, 177 Kan 683, 281 P2d 1080, 1083 (1957).

[8] The evils recited in that case may be summarized as follows: The method assumes the continued existence of a stable demand, a stable price and stable production costs; it eliminates possible competition of better materials or the possible substitution of other materials; it fails to consider the efficiency of management and business judgment as a factor in marketing the materials.

[9] See note 6, supra, and accompanying text.

of the materials as personal property would produce. The presence of the materials in the land would not enhance the value of the land unless the sale of the materials would yield a *net* profit. This would suggest that in computing the value of land the multiplication method would, in fact, be nothing more than a capitalization of profits.[9] However, those courts which accept the multiplication method apparently do not so regard it but consider the product of such computation as one *factor* only in arriving at the value of the land.[10]

It is generally held that evidence of profits derived from a business conducted on land is too speculative to be used in ascertaining the market value of land. However, some courts recognize an exception where the profits proceed directly out of the land condemned and where the profits are the entire or chief source of value. Such an exception was noted in *State of Oregon v. Cerruti,* 188 Or 103, 214 P2d 346, 16 ALR2d 1105 (1950). There it was intimated that in a proper case evidence of profits derived from the use of agricultural lands would be admissible in prov-

---

[9] Occasionally this has been recognized. Thus in United States v. 13.40 Acres of Land in City of Richmond, 56 F Supp 535, 538 (D.C. N.D. Cal 1944) the court said:

"* * * *What they really did was to appraise the present value of the anticipated profits from the sale of the rock material and not the market value of the land itself as of the date of the taking.*"

See also, 1 Orgel, Valuation Under Eminent Domain § 163, p. 663 (2d ed 1953):

"The true significance of a ruling excluding realized or prospective income as direct evidence of value is often obscured by the willingness of the court to permit qualified witnesses to give their opinions on the value of the property, even though it becomes apparent on direct or cross-examination, that this opinion is based very largely on a capitalization of earning power."

[10] See cases cited in note 2 supra.

ing the market value of the land condemned. The same principle, if acceptable, would be equally applicable to the business of selling sand, gravel and topsoil from the land sought to be taken.[9] There are some cases, however, holding that profits from the sale of minerals cannot be shown.[10]

As a matter of theory the cases rejecting evidence of profits as too speculative would seem to have the better of it. There is no doubt that the method calls for the employment of data which is based upon a certain amount of conjecture. But this is true of all estimates of value. The estimate must be made and as a practical matter it is frequently impossible to arrive at the value of land unless the capitalization method is employed in some fashion. Even where there is some evidence of comparable sales of similar land, the differences in land (represented principally by the differences in the quantity of the available materials the sale of which gives the land its principal value) necessitates a consideration of the profits derivable from the sale of the materials.

Plaintiff contends that if the capitalization method is to be used at all it can be used only if there is no evidence of sales of comparable property. It is argued

[9] Cf., State v. Suffield & Thompsonville Bridge Co., 82 Conn 460, 74 A 775 (1909) (profits from toll bridge); Columbia Delaware Bridge Co. v. Geisse, 38 NJL 39 (1875), aff'd. 38 NJL 580 (1876) (profits from ferry); Brainerd v. State, 74 Misc 100, 131 NYS 221 (Ct Claims NY 1911) (profits from retail coal business and dock on canal used together where location was excellent).

[10] 4 Nichols, Eminent Domain 427 (4th ed 1962); Horgan, Mineral Valuation in Eminent Domain Cases, 7 Hastings L J 163 (1955). E.g., City of Los Angeles v. Deacon, 119 Cal App 491, 7 P2d 378 (1932) as qualified by County of Los Angeles v. Faus, 48 Cal2d 672, 312 P2d 680 (1957); Cole v. Ellwood Power Co., 216 Pa 283, 65 A 678 (1907); Buckhannon & Northern Railroad Co. v. Great Scott Coal & Coke Co., 75 W Va 423, 83 SE 1031 (1914).

that there was such evidence in the present case. It is not clear from the testimony of the value witnesses whether they were testifying as to the value of comparable land. Apparently the sales referred to were sales of land the price of which was determined on the basis of the value of the land for *farm* purposes. This would not indicate what gravel land would sell for on the market. However, conceding that the sales compared were of lands having value in the market because they contained saleable topsoil and gravel, the price which would be paid for such lands would be determined by the profit which could be derived from the sale of the soil materials taken from the land. We see no reason why the value witness should not be permitted to use the factors which a well informed buyer himself would use in arriving at the price he would pay for the property.

■ The capitalization of income when properly employed is an acceptable method of arriving at the value of property.[39] There is no reason why it should not be employed with proper safeguards in the valuation

---

[39] The capitalization of rentals is not uncommon. State of Oregon v. Cerruti, 188 Or 103, 108-109, 214 P2d 346, 349, 16 ALR2d 1105, 1109 (1950); Gauley & Eastern Railway Co. v. Conley, 84 W Va 489, 100 SE 290, 7 ALR 157 (1919); Winner, Rules of Evidence in Eminent Domain Cases, 13 Ark L Rev 10, note 7 at p. 18 (1958-59). Similarly, capitalization of profits derived from farming is recognized as an acceptable method of establishing the value of farm lands. State of Oregon v. Cerruti, supra at 108-109. See e.g., Alabama Power Co. v. Herzfeld, 216 Ala 671, 114 So 49 (1927); City and County of Denver v. Quick, 108 Colo 111, 113 P2d 999, 134 ALR 1120 (1941); Stolze v. Maintowoc Terminal Co., 100 Wis 208, 75 NW 987 (1898). See also, Public Market Co. v. Portland, 179 Or 367, 170 P2d 586 (1946), cert. denied, 330 US 829, 67 S Ct 861, 91 L Ed 1278 (1947). The reasons which are advanced to support the use of the capitalization method in these cases are applicable to the cases in which the income is derived from minerals or soil materials. See IX Seligman, Encyc of The Social Sciences, Land Valuation, 137 (1948).

of land, the principal value of which is attributable to income produced from the sale of soil materials. This does not mean that the value of the land can be estimated simply by multiplying the quantity of materials times the existing market price per unit. The appraiser must refine the computation by deducting costs of operation, making allowances for variances in the market price of the materials, calculating the extent of the market for such materials in relation to the amount of materials taken, the possible rise and fall of income, and accounting for other factors which expert appraisers take into consideration in applying the capitalization method.[15]

The capitalization method or any other method of evaluation is merely a rough guide in estimating the value of property. It is recognized that the appraisal of property involves a considerable amount of guesswork. And at the litigation stage the uncertainties are compounded because the appraisals frequently reflect the bias of the witnesses.[16] But an estimate must be

---

[15] See McSweeney, Evaluation of Mineral Rights, 5 Appraisal and Evaluation Manual of the American Society of Appraisers, 153 (1960); Parks, Examination and Valuation of Mineral Property (4th ed 1957) passim; Marston, Winifrey and Hempstead, Engineering Valuation and Depreciation, 364 et seq. (1953); IX Seligman, Encyc of The Social Sciences, Land Valuation, 137 (1948).

[16] "* * * Since the witnesses derive their fees from the one or the other party to the controversy, the trial often amounts to a mere battle of lies. To some extent the exaggerations and prevarications of the witnesses are discounted by the tribunal as a result of the cross examinations. But few juries and judges are equipped to form independent judgments on matters of such a technical nature, and the award is often a meaningless compromise between the values testified to on both sides. There is a crying need in the United States for the use of skilled commissions and specially trained judges in the trial of important valuation cases." XI Seligman, Encyc of The Social Sciences 213-214 (1948).

made and the courts must do the best they can with an imperfect method.

■ Therefore, it is our conclusion that the so-called multiplication method, a form of capitalizing profits as indicated above, may be used by an expert witness as a factor in forming his appraisal of the value of the land. The method may not be used unless the witness takes into consideration all of the ingredients of the method referred to above. The complexities involved in using the capitalization method make it evident that no one but an expert appraiser having knowledge of the intricacies of the capitalization method is competent to employ it.[⑩] This will mean that the witness will not be qualified to use the method unless he has sufficient knowledge of its intricacies to be able to apply it intelligently.

In the present case defendants' witness Nunes was one of the owners of the property being taken. Although he was engaged in the business of selling the soil materials from the land, it was not shown that he had the requisite knowledge to apply the capitalization method properly. He testified that he had computed the value of the topsoil, sand and gravel "in place." But the computation which he used was based upon the sale of the materials as personal property and not

---

[⑩] These complexities are revealed in the texts cited in note 15 above. The formula suggested in the essay on Land Valuation in IX Seligman, Encyclopedia of The Social Sciences, p. 137 (1948) will serve to illustrate the complexity of the subject. There the formula for capitalizing annual income is as follows:

$$V = \frac{a}{r} + (\text{or} -) \frac{i}{r} - 2,$$

where $V$ is the value of the land, $a$ is the annual income, $r$ is the rate of interest and $i$ is the expected annual increase or decrease.

as a part of the land. This is brought out in the following testimony:

"Q Now, with reference to sand and gravel in place, are you also acquainted with the market generally in the Medford vicinity for sand and gravel?

"A Yes.

"Q And is the price you get the same as everyone else gets for the same quantity and quality and location of sand and gravel?

"A Mostly. We bid on some jobs and a lower man gets the job sometimes.

"Q But for the price of sand and gravel in place—

"A Oh, in place, it is the same.

"Q And, as of February 9th, 1961, what was the current rent—that is, the fair cash market value of the sand and gravel per cubic yard?

"A Fifteen cents."

■ It is apparent from the record that Nunes' estimate of value which was based upon the sale of the materials by the yard did not include the cost of production and the cost of doing business (except the cost of hauling), nor did it take account of the extent of the market for such materials in relation to the amount of the materials taken or the other factors considered by experts in employing the capitalization method. Even if Nunes had given testimony on these refinements necessary to properly apply the capitalization, he was not qualified to express an opinion in that respect.

While no objection was made to Nunes' qualifications as a witness and is not assigned as error on appeal, nevertheless timely objection was made to the use of the capitalization method itself and since it was not properly applied the case must be remanded for a new trial.

In view of the possibility of a retrial it is advisable that we pass upon the question of whether a witness properly using the multiplication method may disclose to the jury specifically how he arrived at his estimate. We have made reference to the cases holding that the so-called multiplication method may be used but that the specific manner of its use may not be disclosed to the jury by the proponent of the evidence.[19] 1 Orgel, Valuation Under Eminent Domain § 164, p. 667 (2d ed 1953) comments on the "willingness of the courts to admit various types of evidence bearing on income, but not specifying its exact amount." He continues: "Evidently, the tribunal may be allowed to get a taste of the owner's juicy pie, and to look at it from a distance, even though it may not be permitted to become 'confused' by a measurement of its enticing dimensions."

The ground for excluding the witness's description of the specific process of computing the capitalized value is not always made clear in the cases. Thus, in *Hollister v. Cox,* 131 Conn 523, 41 A2d 93, 156 ALR 1412 (1945) the court recognized that the existence of mineral deposits could be considered by the witness in estimating the value of the land, but deemed it important to note that the questions put to the witness relating to the presence of gravel and its marketability were in general terms. The court said: "Neither this question nor the others objected to contained any requests for details as to the number of cubic yards of gravel or similar matters. They were properly framed." (131 Conn at 526, 41 A2d at 95.) No explanation was given by the court for the restriction on the disclosure of the details employed in estimating the value of the land. The basis for this restrictive rule

[19] See note 4, supra.

appears more clearly in other cases. In some cases the details of computation are excluded on the ground that such evidence would raise collateral issues.[9] Thus in *City of Los Angeles v. Deacon,* 119 Cal App 491, 495, 7 P2d 378, 379 (1932) the court said:

> "* * * To accept a statement of net profits as a fact to be taken into consideration in arriving at market value, of necessity opens the door: To an investigation into the accounting system of those operating the plant; into the costs of original installation and replacements; raises questions of efficiency and skill; and leads into innumerable other side roads and alleys."

In *State of Oregon v. Cerruti,* 188 Or 103, 214 P2d 346, 16 ALR2d 1105 (1950), where an effort was made to show profits that might be realized if in the future the property were put to a particular use, the court held that the evidence was not admissible because it "introduces collateral issues and is too speculative and too likely to mislead the jury * * * as a factor in determining value." The court was careful to point out, however, that " 'it would be unwise to lay down a hard and fast rule applicable to every case, as to what elements properly enter into consideration in determining the market value of property sought to be condemned.' " (188 Or at 113-114, quoting from *Chairman of Highway Commission v. Parker,* 147 Va 25, 136 SE 496).

The danger of such evidence misleading the jury has been more specifically explained in other cases. In some cases the explanation is in terms of the incompetence of the jury to understand the complexities

---

[9] See 4 Nichols, Eminent Domain § 12.311 [3], p. 93 (1962); 1 Orgel, Valuation Under Eminent Domain § 162, p. 662 citing cases at note 21 (2d ed 1953).

of the capitalization method of measuring value. As one court has put it: "The gross estimates of common life are all that courts and juries have skill enough to use as a measure of value."[20] 1 Orgel, Valuation Under Eminent Domain § 162, p. 657 (1953) makes the point more specifically:

"* * * An expert may say that prospective earning-power is the only earning power worth considering. But a court may nevertheless exclude a witness's estimates of this prospect, because a jury, or a judge himself, is in no position to weigh their probability and to apply a proper rate of capitalization."

It may be that some courts exclude detailed evidence of capitalization to minimize the danger of the jury computing the value simply by multiplying the quantity of materials by the unit price and as a consequence returning an excessive verdict.[21]

■ The difficulties and dangers recited above perhaps are real. But weighed against these objections is the advisability of permitting the jury to have all the available data from which to draw its inferences. In other areas of litigation it is well established that the data and reasoning upon which an expert witness relies may be presented to the jury.[22] We see no reason for making an exception in condemnation cases. Therefore, we hold that a witness testifying as to the value of land containing sand, gravel or other merchantable

---

[20] Searle v. The Lackawanna and Bloomsburg Railroad Co., 33 Pa 57, 64 (1859). For cases permitting evidence that profits were made but not the amount of such profits, see 1 Orgel, Valuation Under Eminent Domain § 164, p. 668 (2d ed 1953).

[21] See State Highway Comm. v. Arnold, supra at p. 84 where we alluded to the possible danger of juries returning excessive verdicts in condemnation cases.

[22] Highway Com. v. Morehouse Holding Co., 225 Or. 62, 357 P2d 266 (1960).

soil materials may be questioned on direct examination as to the details of his computation of capitalized value. However, if the witness testified as to value upon the basis of the capitalization method, the adverse party may insist that the method be employed fully and not simply by showing the quantity of the materials and the unit price for such materials, as was done in the present case. Then, too, the adverse party may cross-examine a witness in detail as to the method employed in capitalizing income.[23]

The range of inquiry will depend in part upon the character of the business being conducted, the period of time during which the business has been conducted, the quantity of materials available, the demand for such materials, price stability, other factors relevant to the stability of the business, and the net profits which it is likely to produce in the future.[24]

The judgment of the lower court is reversed and the cause is remanded for a new trial.

DENECKE, J., dissenting.

The majority holds that the capitalization method, properly applied, may be used by an expert appraiser in determining value. The majority opinion further states that an expert can testify how he used this method in determining value. With this I concur.

---

[23] Cf., City of Los Angeles v. Deacon, 119 Cal App 491, 495, 7 P2d 378, 379 (1932): "* * * A witness who has given an opinion as to market value, may be asked on cross-examination if he knew of the net profit and what importance, if any, he attached to it, but such questions are permitted to test the value of the opinion ventured, and not because the sum involved is to be made use of by the court or jury as a basis for computing market value." The case was overruled by County of Los Angeles v. Faus, 48 Cal2d 672, 312 P2d 680 (1957) on different grounds.

[24] For cases showing this variation, see 1 Orgel, Valuation Under Eminent Domain § 164 (2d ed 1953).

The majority, however, remanded the case for a new trial on the ground that the capitalization method was here improperly applied. To this I dissent, for the reason that the Commission's objection was not that the capitalization method was being improperly applied, but that the capitalization method could not be used under any circumstances in determining value.

SLOAN, J., dissenting.

I dissent from that part of the opinion in this case which holds that reversible error was committed by the trial court. In addition to the reason stated by Mr. Justice DENECKE, I am of the opinion that any error was cured by instruction of the court to the jury.